THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY BUSSEY, Appellant.

First Department, April 13, 1978

### APPEARANCES OF COUNSEL

*Philip L. Weinstein* of counsel *(Martin Erdmann* and *William E. Hellerstein,* attorneys), for appellant.

*Jacob Apuzzo* of counsel *(Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney),* for respondent.

OPINION OF THE COURT

*Per Curiam.*

Defendant appeals from a judgment convicting him following a jury trial of two counts of robbery in the first degree arising out of a theft alleged to have occurred on April 19, 1975. The record plainly and clearly demonstrates that defendant's due process right to a fair trial was impinged upon by the overzealous procedure of the prosecutor. His improper conduct continued throughout the trial, despite repeated admonitions by the court. It was patently aimed at conviction at whatever cost in a case where the sole issue was one of identification of defendant by one of the victims.

On April 19, 1975, at about 10:30 P.M., J.H. and her mother were returning home from a church meeting when they were approached by two men, one with a knife and the other with a gun, who demanded their purses. J.H. adhered to the robbers' direction, but her mother resisted until one of the robbers put a gun to her head and twice pulled the trigger. Hearing two clicking sounds, J.H. directed her mother to comply by surrendering her purse. Later, J.H. described the robbers to the police. She described one, subsequently identified as defendant, as dark-skinned, 130 to 135 pounds, with an Afro and no facial hair, wearing a short tan brown leather jacket, dark pants and sneakers. Four days after the robbery, J.H. and her mother went to the police precinct to view mug shots. Upon entering the station house, J.H. saw the defendant at the far end of the room. She said she recognized defendant. She said to the desk sergeant, "We came here to look at some mug shots. * * * But I think that's the young man there." She pointed to defendant. J.H.'s mother became hysterical at this point. However, she could not identify defendant. J.H. subsequently on the same day confirmed her prior identification by a show-up through a one-way mirror. Defendant was arrested on J.H.'s identification through the one-way mirror, after he had declined to participate in a lineup or to be photographed.

Upon the trial, defendant's girl friend, Cathy Ladson, testified that defendant was with her on the day of the robbery until 10 P.M. and that about 10:15 P.M., she overheard a discussion between her brother Sam and defendant in the hallway outside her apartment. In substance the two were planning to go to a party. Sam confirmed this, testifying that he and defendant went to a party where they remained for about one-half hour and that he was with defendant on the

night in question continuously until 12:30 A.M., except for a 15-minute period between 10 and 10:30 P.M. Defendant also testified on his own behalf. His testimony was substantially the same as the Ladsons. He denied any participation in the robbery. He explained that on the day he was identified by J.H. as one of the robbers he was at the police precinct because his cousin had been arrested in a welfare office on an unrelated matter. She had her children with her and defendant went to the precinct to take custody of the children.

In the light of this sharp underlying factual dispute, the prejudicial and improper conduct of the prosecuting attorney may well have been crucial. His cross-examination of Cathy Ladson was so abusive that the court was required several times to admonish him not to scream at the witness, "I don't want you * * * to beat this witness." The Assistant District Attorney accused defense counsel of signalling answers to the witness and suggested that she had been briefed by defendant or his attorney, stating, "I don't want this witness to do what she pleases. We are trying to find out what she really knows, not what she is making up." When Sam Ladson testified, the prosecutor asked, "Isn't it a fact that on April 19th you don't remember a single thing; you were told what to remember by your sister, and the defendant, and his lawyer; isn't that not a fact?" Although the court properly struck the question, the potential prejudicial effect on the jury is clear.

Almost at the very beginning of defendant's cross-examination, the prosecutor asked: "During the course of your meetings with [defense counsel], were you instructed to say anything on behalf of the defense." Notwithstanding that defendant's objection was sustained, the prosecutor inquired: "During the course of your meeting with [defense counsel] would you tell me the nature of the conversation; did your lawyer tell you anything about how to prepare your defense?"

Similarly prejudicial was the irrelevant collateral interrogation of Michael Sasportas, who had been called by the defense as a character witness to testify as to defendant's reputation for truth and integrity. The prosecutor's cross-examination of Mr. Sasportas with respect to school disruptions caused by defendant, leading to his eventual suspension, went far afield and had no apparent relation to the underlying issues.

Although these instances, standing alone, may be insufficient to require reversal, the record contains other clear examples of highly prejudicial prosecutorial misconduct which

so infected the entire proceeding as to deprive defendant of his due process right to a fair trial. When defendant testified on his own behalf as to his refusal to participate in a lineup or to be photographed at the police station, despite the appropriate instruction by the court that the jury was to draw no inference from the defendant's exercise of his right not to take part in a lineup, the prosecutor improperly inquired, "Were you afraid to have your picture taken?" Although the objection to the question was sustained, the prosecutor again improperly followed with, "Were you afraid to go into the lineup?" Defense counsel's objection was again sustained, but the prosecutor persisted in arguing with the court with respect to its ruling.

During summation, the Assistant District Attorney continued his overzealous and improper conduct. He disparagingly referred to the "so-called presumption of innocence" and thereafter sought to invert the burden of proof when he argued to the jury, "Don't forget you have to find him not guilty by a reasonable doubt." When the court sustained the objection to these remarks and cautioned the jury that the Judge would define "reasonable doubt", the prosecutor retorted: "You all promised me that you would not hold the People—to require the People to prove this defendant's guilt beyond all certainty in your minds. I hold you to that and the defense is asking you to require the People to prove him guilty beyond all certainty in your minds." When the Judge again sustained an objection and attempted to cure any prejudicial effect by stating he would instruct on reasonable doubt the following colloquy occurred:

"[DEFENSE COUNSEL]: Objection. That is unfair comment 'beyond all certainty.'

"[A.D.A.]: That's what the defense said in summation. He is interrupting me with a ten-minute limit on purpose.

"[THE COURT]: There will be no further interruptions. I don't want this jury to be confused on the question of law. The question of reasonable doubt will be instructed as to that. All right. Let's proceed.

"[A.D.A.]: Of course, one always wonders but always ask yourself in that jury room when you are instructed as to what this law is. Remember every single person who ever faces a criminal charge, every single person ever convicted in this country by a jury such as yourselves, has been presumed innocent until a jury came down and found him guilty beyond

a reasonable doubt. The very same standards and formula was used. All of those tens of thousands of people who have been convicted of crimes have the very same protection, not so unique to this man, the so-called presumption of innocence, this cloak of truth—

"[DEFENSE COUNSEL]: Objection. So-called is not the word. We don't have so-called presumptions of innocence under our system. We have a presumption of innocence.

"[THE COURT]: So-called is an improper word and I charge the jury to consider the improper word. This is no so-called. This is a basic foundation of our justice system, and the word and the use of so-called before the presumption of innocence is improper and I charge you with that, and there will be no further reference to adjectives to something that is so basic and basic to our system of justice.

"[A.D.A.]: I take exception to the Court's ruling. This presumption of innocence is not unique, and not only is it not unique, it cannot cloak the truth from you. You are the judge of the facts and nothing his Honor says or the defendant says or the defendant's lawyer says can interfere with you. Nothing. That's your province."

Subsequently, also during summation, the Assistant District Attorney again improperly argued to the jury. "So, add up these little things and hope that you go to the question of reasonable doubt and hang your head on reasonable doubt taking the easy way out; don't take the easy way out. You have a job to do." Objection to this remark was sustained, the court instructing the jury that the question of reasonable doubt was not the easy way out.

Although the court carefully attempted to cure the repeated prejudicial statements by detailed instructions to the jury, both with respect to the "presumption of innocence" and with regard to "reasonable doubt", the damage was beyond repair. No curative instruction could suffice to counteract the cumulative effect of the highly prejudicial and inflammatory statements by the prosecutor, which, in the words of the Trial Justice, demonstrated "a complete lack of knowledge" and "insensitivity to the basic rights" of a defendant in a criminal trial. The characterization of the fundamental constitutional right under which an accused is presumed innocent until proven guilty beyond a reasonable doubt as "so-called" is a flagrant disregard of the law. It is an intolerable interference with defendant's rights and the court's province, as is the

prosecutor's attempt to shift or invert the burden of proof, which clearly must remain on the People throughout.

On this appeal the Bronx District Attorney does not purport to condone the outrageous and abusive conduct of the prosecuting assistant. Conceding on this appeal that the possibility of prejudice was great, it is argued that the careful and extensive instructions of the Trial Judge were curative. However, on this record it is clear no instruction to the jury, no matter how detailed or elaborate, could suffice to cure the repeated and continuing highly inflammatory and improper remarks and abusive conduct which plainly infected the entire proceeding. The Trial Justice, in commendable and proper fashion, went to great lengths in his instructions to the jury to attempt to overcome the prejudice which the People had injected into the trial. We find no fault with the court's instructions. Nonetheless, the impropriety was so pervasive that there was no way to cure the cumulative effect of the prejudicial conduct. The fact that this was a fairly close case, with an alibi defense supported by at least two witnesses, and an identification of the defendant by only one of the two victims, accentuates the impropriety of the remarks and conduct of the prosecutor. The repeated disregard and overriding of the court's rulings and instructions eroded the court's corrective efforts. Such prejudicial conduct mandates that the judgment of conviction be reversed and that the matter be remanded for a new trial. As this court observed in *People v Petrucelli* (44 AD2d 58, 59): "A prosecutor's performance, aimed at justice and not a conviction, must reflect self-discipline *(United States v. White,* 486 F. 2d 204; Code of Professional Responsibility, EC 7-13)." Here, there was no attempt to comply with that standard. In the light of our determination that there must be a new trial, we deem it unnecessary to reach the other issues presented on this appeal.

Accordingly, the judgment of the Supreme Court, Bronx County (GOLDFLUSS, J.), rendered February 8, 1977, convicting defendant of two counts of robbery in the first degree, should be reversed, on the law and as a matter of discretion in the interest of justice, and a new trial granted.

BIRNS, J. P., FEIN, MARKEWICH and SULLIVAN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on February 8, 1977, unanimously reversed, on the law and as a

matter of discretion in the interest of justice, and a new trial granted.