Meyer, J.
(dissenting). The United States Supreme Court has held “that the atmosphere essential to the preservation of a fair trial — the most fundamental of all free *402 doms — must be maintained at all costs” (Estes v Texas, 381 US 532, 540). Because a reading of the transcript of defendant’s trial shows that the Assistant District Attorney was determined to obtain a conviction at any cost, including the misstatement of prior testimony on no less than seven occasions while cross-examining defense witnesses or in summation, I cannot accept the majority’s conclusion that defendant’s trial was fair. I would, therefore, reverse and remit for a new trial.
I
Between 9:45 and 10:00 P.M. on January 4,1976, Magda Calero was returning with her five-year-old son to the apartment in which they lived at 751 East 161st Street in New York City. As she crossed the street someone behind her pulled her shoulder bag hard enough to break its straps and cause her to fall on her back. When she fell she looked up and for “a couple of seconds”, as she estimated, saw the face of the person who had done so. That person dropped the bag on the ground, one of the two other, young men with him came back and picked it up, and all three then ran around the building. Ms. Calero ran after them, asking that they keep the money but return her bag and papers, but because her son was hysterical she stopped and returned to him.
As she did so, she heard someone call her - from the side of the building who said to her in Spanish “Señora, lady, come over here. This is one of the men that did it.” Next to some bushes on the side of the building toward the front she found Jose Cruz standing and defendant squatting on the ground behind the bushes. She denied seeing Cruz with a gun or hearing any shots fired, though she agreed that defendant made no effort to get up from behind the bushes or leave. She asked defendant why he took her bag, and then because her son was still crying she took him up to the apartment and came back down. She testified that one of the three men had been carrying bananas, which her son picked up and took upstairs with him, but also that she had heard defendant say at the precinct station that he had been to the store and bought bananas.
While she was taking her son upstairs, the police arrived *403 in response to a “shots fired” radio run. The call that occasioned that run had come from Ms. Mary Taylor, who lived at 731 East 161st Street in an apartment that faced 751 East 161st Street. Ms. Taylor testified that a few minutes after she heard two or three shots she went to her window and saw a Spanish man with a gun standing over a black man on the ground. She also saw a Spanish woman there. She knew the man and woman were Spanish because only Spanish and blacks lived in that neighborhood. She opened her window and yelled that the man with the gun should not shoot the man on the ground, that she was calling the police. She called the police and reported the incident, and then put on her coat and went down to the courtyard between the two buildings, by which time the woman she had seen was gone and the Spanish man did not then have a gun. She was there when the police arrived. There were many policemen. They did not question her, but she told one of them what had happened.
Cruz testified that he saw a lady walking with her son on 161st Street, took a shortcut through the park and while in the middle of the park heard a scream and saw three men running, one of whom was carrying a purse. He hesitated and then pursued them. They had gone around the building and he went after them. One of them fell and crawled into the bushes. He walked up to the man and recognized defendant, whom he knew from school. Defendant asked him to “Let me go”, but he refused to. The lady (Ms. Calero) came up and saw defendant. Cruz “told her this was him and she goes yeah.” He then told her to take her son upstairs. While she was doing so the police arrived with drawn guns and took him into the building. Defendant was still on the ground and Cruz told the police to take him into the building too, which they did. Both were frisked and no gun was found. Cruz told the police defendant was robbing the lady and when Ms. Calero return to the lobby she pointed out defendant as one of the men who took her pocketbook. Cruz first testified that he never lost sight of defendant while running, but on cross-examination admitted that he. did lose sight of all three men for “one split second” as they ran around the corner of the building.
*404 Defendant testified that he had been to a store where he bought some bananas and was returning to his home when he heard shots and saw sparks from a gun, realized someone was shooting at him and jumped into the bushes. Cruz ran down to him, put a gun in his face and said “Don’t move.” Defendant said to Cruz “Let me go man, don’t shoot.” Cruz then said “Thief, you stole a pocketbook” and defendant responded “Man, I didn’t steal anything.” Ms. Calero came up. Cruz said “Here is one of them” and Ms. Calero accused defendant of being a thief. Defendant, who had been shot once before, stayed on the ground because of the gun until the police arrived and took Cruz and defendant into the apartment hallway. Ms. Calero got off the elevator, looked at defendant and said “He is the one.” Defendant denied that he knew anything about a robbery of Ms. Calero or had seen three men running. He testified that he was alone and that when he was taken to the precinct he still had three of the five bananas he bought. He also testified that he had never been arrested and was employed until he began attending community college.
Apparent from the foregoing recital of the evidence is the fact that, as the Trial Judge told the jury after they reported themselves deadlocked: “The only issue here is one of credibility, whether or not you believe the defendant’s witnesses or whether you believe the People’s witnesses.”[1] Ms. Taylor confirmed the presence of a gun in Cruz’ hand as he stood over defendant and the firing of shots. The radio run of “shots fired” to which the police responded confirmed her testimony that she had called to make that report, which in turn tended to confirm defendant’s testimony that Cruz had fired shots at him. The absence of the gun when the police arrived, the testimony that Ms. Calero’s son had picked up bananas, and her several identifications of defendant strongly and adversely affected the defense contentions, but were themselves tainted in part by Cruz’ statement to her before she saw *405 defendant that he was “one of the men who did it” and by her having overheard his statement at the precinct station that he had bought bananas.
II
Against this background is to be measured whether the prosecutor struck only hard blows or whether he struck foul ones (Berger v United States, 295 US 78, 88; see People v Jones, 44 NY2d 76, 80). I can reach no other conclusion than that he struck foul ones for he cross-examined and summed up on the basis of nonexistent evidence, asked improper questions and made improper comments during trial, made improper comments in his summation, and clurthe trial sought to leave the jury with the impression that the Trial Judge was treating the People unfairly in his rulings.
A
USE OF NONEXISTENT EVIDENCE
Cross-examining Ms. Taylor, the prosecutor first got her to state that when she first looked out her window she saw defendant lying on the ground and a man standing over him with a gun. He then asked whether from 50 feet (the distance from her window to where defendant was) she could recognize the man on the ground as Vincent Galloway. Her response was that she could not from the window, that she had gone down to the courtyard. To the prosecutor’s next question: “Yet you told the jury, did you not, that you recognized the man as Vincent Galloway,” she answered “That is right” and he followed up with “So what you just told the jury before was not true?” Yet neither on direct or cross-examination had Ms. Taylor told the jury that she recognized Galloway from the window. The Trial Judge at that point called a robing room conference during which he told the prosecutor that he did not intend “to allow his courtroom to be used to distort testimony” and that he “must be intellectually honest about it.” When the Judge and the attorneys returned to the courtroom, cross-examination resumed without any answer to the offending question but also without any comment by the court.
Thereafter, during cross-examination of defendant, he *406 testified that after he saw sparks and heard shots he reacted and jumped into the bushes. The prosecutor then asked defendant whether he saw the sparks and heard the shots while standing or while in the bushes. The Trial Judge intervened and broke the question into two parts, obtaining answers that defendant was walking when he heard and saw the shots and did not hear them when in the bushes. The prosecutor’s next question was: “Was it confusing before when I asked you the same question and you gave me a different answer?” (Emphasis supplied.) There had been no different answer. Objection to the question was sustained and it was ordered stricken, but nothing was said that would have alerted the jury to the reason it was stricken.
One subject of cross-examination concerned who the officer was that told defendant to get up from the ground and go into the hallway and what was said at the time. Two officers, Feliciano and Valle, testified at the trial but there were a number of others present at the 161st Street scene on January 4, 1976. Defendant testified that he was helped up by an officer and that it was not Officer Feliciano who did so. The prosecutor then asked “Was it the other officer?”, to which defendant responded “It was so many of them, I really don’t know who it was.” Defendant was then asked about events in the hallway and replied that “they * * * put me up against the wall but I tell you for a fact it wasn’t Feliciano or Valle.” Though the first answer concerned who helped him up and the second who put him up against the wall, there followed a series of questions which established that defendant did not know whether the officer who helped him up was one of the two officers who testified and that to the best of defendant’s recollection it was not either Feliciano or Valle who took him into the hallway. Though there was no inconsistency in the answers given, the prosecutor’s next question was “It wasn’t, so you are not being entirely truthful or correct when you told these jurors.” Objection to that question was overruled.
During the same exchange with respect to who helped defendant up, the Assistant District Attorney asked “Mr. Galloway isn’t it a fact the officer at gunpoint ordered you *407 into the hallway? He said, ‘Mr, Galloway’ — without knowing your name — ‘Get up, get in there’ ?” The clear implication of the question was that though Galloway had not given the police his name it was otherwise known to the police, an implication which rested on no evidence whatsoever, but objection to the question was overruled.
Officer Feliciano testified that at the station house defendant told him he had been to one of the stores to buy something and that Ms. Calero had identified defendant as being one of those who grabbed her pocketbook but the officer never testified that defendant himself stated that he was other than alone. That did not stop the prosecutor from asking defendant on cross-examination “Do you recall Officer Feliciano testifying * * * that you did state that you went to a store to buy something. He couldn’t recall what, and, you were with one or two of your friends. Did you hear him testify as to that?” (Italics supplied.) Objection was overruled. Defendant reiterated that he was alone. That misstatement of the testimony was implicitly reiterated when the prosecutor in summation stated with respect to Feliciano’s testimony: “He didn’t recall what the guy said he went to buy but he did recall he went with a friend * * * I guess the defendant forgot that testimony because when he got on the stand, was alone all the time.” He followed that with the comment on defendant’s testimony: “Said he went to the store to buy some bananas. Tells us he went alone. Already he is telling us by saying he went alone that the officer is wrong and that the lady is wrong. [Defendant’s attorney] elevated that wrong to say that the officer wasn’t telling the truth and the lady wasn’t telling the truth” (italics supplied). However, defendant’s attorney’s summation included no statement that the officer hadn’t told the truth in this respect and could not have since the officer never testified that defendant said he was not alone.
Ms. Taylor testified that she was down in the courtyard when the police arrived and that less than five minutes passed from the time she left her window until she went downstairs. The prosecutor, cross-examining defendant as to where Ms. Taylor was when he was taken into the hallway, asked “Didn’t you hear Miss Taylor say it took *408 her about five minutes before she went down, after the police arrived, didn’t you hear her tell you that?” Objection that that was never Ms. Taylor’s testimony was implicitly overruled by the court’s statement “I believe it was.” After defendant reiterated that Taylor had indeed been there when the police arrived, the prosecutor followed up with “Now if Miss Taylor did say she wasn’t down there, who would be lying, you or Miss Taylor.” Following that up in summation, the prosecutor argued with respect to Ms. Taylor that “She goes over to the window, opens the window three to five minutes later. The police were already there” (italics supplied).
Finally, though Ms. Calero testified on direct examination that when she took her son upstairs “I told my brother I had been mugged” and that she “came right back downstairs. When I got downstairs the cops were there” and on cross-examination that “I went downstairs immediately. I did not have a chance to call the police” (italics supplied), the prosecutor stated in summation “What is so abnormal about the lady taking the crying kid up stairs and come down, call the cops. She testified to it. It is in the testimony. Defense overlooked it. It is there” (italics supplied).
Concerning the impropriety of such gross distortions of the testimony citation of authority is not needed, but is not lacking (e.g., People v Ashwal, 39 NY2d 105, 109-110, and cases cited). Moreover, the instances recounted are sufficient in number strongly to suggest that they were not unintentional and by themselves, in any event, constitute a sufficient basis for reversal of defendant’s conviction. There are, however, additional reasons for doing so.
B
IMPROPER QUESTIONS AND COMMENTS
The majority opinion refers to the prosecutor’s use of the word “prime” and similar words suggesting that defense witnesses were telling a concocted story, and says that they “may have been improper”, but notes that the Trial Judge directed that the term not be used again. What it fails to note is that despite the strong language in which the direction was phrased (“Don’t you dare use that word *409 again”), the prosecutor did in fact use it again, as he also continued, notwithstanding directions not to do so, to make gratuitous side remarks as well as to badger, and characterize the testimony of, defense witnesses in his unrelenting effort, no matter what instructions he received from the court, to convey to the jury his view that what the defense was presenting was a tissue of lies.
It would unduly prolong this opinion to record all of the improper questions and comments. They ranged from the statement, in response to defendant’s attorney’s objection to a question because the same question had just been asked and answered: “Are we trying to get the truth here? Defendant is trying to suppress — ”, through statements that defendant’s attorney objected in order to “prep”, “key” or “guide” witnesses in their testimony. Similarly, he responded to the court’s ruling that Ms. Taylor had already answered a question with “I know that. I get multiple different answers from her”; to the court’s statement that Ms. Taylor was under oath by commenting: “Many people lie under oath. I am asking if she is here to tell the truth”; and when defendant responded to one of his questions about when defendant heard and saw the shots with: “I don’t know, what you trying to do man”, by himself responding “Trying to get the truth out of you, Mister.” He prefaced one question with “Answer my question. I don’t need your tailored testimony” and several times inquired “You mean the police are lying”, “Are you saying to this jury that the police officers also were lying?”, “Everybody is lying but you? * * * who would be lying, you or Miss Taylor?”
Not only did the prosecutor denigrate defense counsel and defense witnesses, but also he sought to impress upon the jury that he was being improperly restricted in presenting his case by the Judge. The record is replete with remarks such as “Give the People a fair shake. The defense gets.all the repetition”, “Would you let me conduct the direct, Judge”, “You are forbidding me to rehabilitate my witness”, “You are precluding me from testing the powers of observation, what she could see?”, “I am held strictly to the rules”, “I am now back to the strict rules I am being *410 held to”, “You are forbidding me to make a proper summation?”
Small wonder, then, that when defendant’s counsel objected to one of the prosecutor’s side remarks the Trial Judge responded: “You tell me how to close his mouth.” Pertinent concerning the prosecutor’s many improprieties in this respect is the statement made some 60 years ago by the Appellate Division, Fourth Department, in People v Teiper (186 App Div 830, 839) that: “The learned judge who presided at this trial endeavored to give the defendant such a [just and fair] trial, but we think that the conduct of the district attorney was such as to thwart that purpose. He was admonished time and time again not to comment upon statements of witnesses and to refrain from making improper remarks, but he did not heed the admonitions of the court. The fact that he may have believed, and even had good ground for his belief, that the defendant was guilty did not justify him in constantly and improperly injecting his belief into the case and in making improper remarks during the progress of the trial so as to prejudice the jury against the defendant and improperly influence their verdict.”
C
IMPROPER SUMMATION
Examples of the prosecutor’s use in summation of a false version of the trial testimony have already been given and will not be repeated. There were, however, a number of additional improprieties.
Thus, the peroration of the summation was: “You, each of you, represent tens of thousands of people in the community. You are not law enforcement but you are an important part of the judicial system. What you do in this case cannot be undone. As the defendant cries for justice, so does the victim and the People. There must be justice. These streets must be made safe for our women in the streets” (italics supplied).
The attack upon defendant’s attorney continued during summation and was accompanied by gratuitous and im *411 proper remarks. When the prosecutor accused him of trying “to hide the facts”, defendant’s attorney’s objection that the defense had not tried to hide the facts was overruled, to the accompaniment of the prosecutor’s “Oh really?” Objection to the prosecutor’s reference to the “vivid imagination of the defense counsel who purposely distorts in order to provide a defense” was also overruled, and then followed (ironically in view of his own macerations of the truth) by the prosecutor’s comment that “Half of that summation was not the testimony. It was surmise, conjecture, created by the defense” (italics supplied). When defendant’s attorney objected that there was no testimony that defendant had said to Cruz “Hey man, this is Vinny Galloway”, the court’s response was “No, not in that manner”, but the prosecutor thought it proper to add “I am merely characterizing the inventions by the defense.” Objection to that remark was not ruled on. When defendant’s attorney asked in response to one such attack that the court instruct the jury as to the duty of an attorney to represent his client and see that only legal evidence goes in, the court’s affirmative response was followed by the prosecutor’s comment: “Duty to see that the truth is heard too.” The court’s effort to clarify the matter by stating “Only legal evidence is permitted” was denigrated by the prosecutor’s retort: “And the truth is presented. Sometimes they conflict. It is not surprising why we get this kind of distortion arguments in the summation of defense.” Defense objection to that wholly improper statement by the prosecutor was overruled. Similarly, when defendant’s attorney in objecting to yet another distortion of the testimony by the prosecutor, who had said that defendant testified “no screams”, stated that “Galloway said, T never heard any screams’ ”, and the Trial Judge agreed that that was Galloway’s testimony, the prosecutor’s response was “Jesus Christ, Judge, this is summation. He wants to rehabilitate his witness in my summation. I never heard of that.” Nor are the foregoing all of the available examples of prosecutor’s incessant references to “distortion”, “creation”, “invention” by the defense, to say nothing of improper characterizations such as “red herring” and “smoke screen”.
*412 Pertinent, once again, is language from an 80-year-old precedent, this time of ours, in People v Fielding (158 NY 542, 547) in reversing the defendant’s conviction because of the District Attorney’s improper summation: “Language which might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment.” .
Lest it be thought that such is no longer the concept of a prosecutor’s function, I note the more recent decisions in People v Arce (42 NY2d 179); People v Ashwal, (supra); People v Alicea (37 NY2d 601); People v Lombardi (20 NY2d 266); People v Steinhardt (9 NY2d 267; see, also, ABA Standards, Prosecution Function [1980], §§ 3-5.6, 3-5.7, 3-5.8), which make clear our steadfast adherence to it until the present case.
Ill
The use of such tactics by a prosecutor sullies not only the trial process but the appellate process as well. This is because the real issue on appeal becomes not was defendant fairly tried but a balancing of whether his guilt is sufficiently clear that the cost of retrial and risk of prejudice to the People’s case from possible unavailability at retrial of prosecution witnesses should not be run. Stated another way, as the Second Circuit in its recent decision in United States v Modica (663 F2d 1173, 1181) noted, there is “a denial of due process when the improper statements [conduct] cause substantial prejudice to the defendant” but often “the existence of substantial prejudice turns upon the strength of the government’s case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is *413 weak, then improper statements are more likely to result in reversal”. Not only does such balancing involve appellate courts in what is essentially a function of the jury rather than an appellate court (People v Mleczko, 298 NY 153, 163), but also it involves a painstaking and searching parsing of the trial transcript of a kind not normally engaged in. One is left with the uneasy feeling that not all trials found not to have been conducted to defendant’s substantial prejudice have in fact been fairly tried. The constitutional mandate then tends to become inverted, a defendant convicted at an essentially unfair trial being required to make a showing of prejudice which will be, at best, difficult to establish.
The majority opinion illustrates my point. To sustain the conviction it seizes upon the giving of curative instructions and the absence of a motion for mistrial, improprieties by defendant’s counsel, and the fact that defendant did not contest that the crime had occurred, but pays no attention to the facts on defendant’s side of the equation recited in the last paragraph of part I above. The proof of defendant’s guilt was far from strong.[2]
That defendant did not contest occurrence of the crime is simply irrelevant, for his defense was not that there was no robbery, but that he had had nothing to do with it. *414 The suggestion that defendant’s attorney did not move for a mistrial is only partly correct for he did do so with respect to the prosecutor’s summation! But the absence of a motion for mistrial and the fact that most, though not every, instance referred to above was objected to by defendant’s attorney are both also irrelevant. As noted at the beginning of this opinion, there is no more fundamental constitutional right than the right to a fair trial. When a trial is as infected by the manufacture of nonexistent facts and other improprieties as was this trial, “no exception is necessary to preserve for appellate review a deprivation of a fundamental constitutional right” (People v McLucas, 15 NY2d 167, 172; see People v Thomas, 50 NY2d 467, 471-472; People v Michael, 48 NY2d 1, 6).
Nor can the presence of curative instructions and of defense improprieties save the conviction. As to the first, it is sufficient to note that in not all cases were such instructions given (indeed in some cases the Trial Judge overruled objections that should have been sustained and a curative instruction given[3]) and that even when such instructions were given the prosecutor so often countered them with gratuitious and improper remarks as to bring forth from the Trial Judge the plaint, already noted: “You tell me how to close his mouth.” As to the second, the reference in defendant’s attorney’s opening to Cruz as a “vigilante punk” was clearly wrong as were some of defendant’s attorney’s remarks during trial. But to equate the relatively few instances that can be found of such conduct with the wholesale improprieties of the prosecutor[4] is to ignore both the realities of the record and the extreme difficulty faced by a defense attorney confronted with such a prosecutorial onslaught. Though goading by the prosecutor no more excuses defense counsel’s improprieties than does the *415 reverse (as the majority notes, pp 398-399), when the prosecutor goes as far in ignoring the Judge’s directions and complaining about his ruling as did this one, we have not hesitated in the past to reverse notwithstanding the defense’s tactics (People v Alicea, 37 NY2d, 601, 605, supra; People v Steinhardt, 9 NY2d, 267, 271, supra).
In sum, if this trial was not a “mockery”, as the majority now holds, there is little probability that prosecutorial misconduct will ever result in reversal.
IV
Reluctance to establish another “exclusionary rule” which may be seen as punishing official misconduct by letting guilty persons go free has, as the Second Circuit noted in Módica (supra),^the unfortunate effect, by approving the conviction thus obtained, of encouraging or at least not deterring such misconduct. As suggested by that court and by Justice Bloom, dissenting in this case, a sanction which can be invoked against such misconduct even though there be no reversal is clearly needed.
Though I, like Justice Bloom, cannot set policy for the court in a dissent, I would be remiss were I not to point out that the same trial assistant involved in this January, 1978 trial was the cause of reversal for “outrageous and abusive conduct of the prosecuting assistant” in People v Bussey (62 AD2d 200, 205 [decided April 13, 1978]) and was the trial assistant whose conduct, though not causing reversal, was branded “improper and tasteless” by the Appellate Division in People v Wheeler (80 AD2d 785), tried in September, 1978. The District Attorney has a continuing obligation with respect to his trial assistants, not only to instruct them clearly and firmly against using such tactics, but also through contact with the Trial Judges and through occasional observation (either himself or by the trial division chief) to assure that his instructions are being adhered to. Trial Judges experiencing the difficulty that the Trial Judge did in this case should not hesitate to acquaint the District Attorney’s office with the problem, and trial and appellate courts should not be hesitant in cases of repeated infraction after appropriate warning to *416 recommend disciplinary action. To be remembered in that connection is that the vice of such prosecutorial misconduct is not only that an innocent person may be unfairly convicted but that it also may, under governing double jeopardy law, result in a guilty person going scot-free (see People v Kurtz, 51 NY2d 380, 387; Ann., 98 ALR3d 997; cf. People v Isaacson, 44 NY2d 511, 525).
For the foregoing reason, my vote is to reverse and remit for a new trial.
Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Fuchsberg; Judge Meyer dissents and votes to reverse in a separate opinion in which Chief Judge Cooke concurs.
Order affirmed.

. Though such a charge is generally objectionable “because it prevents the jury from construing the evidence and determining what facts it does establish” (Dolan v Delaware & Hudson Canal Co., 71 NY 285, 290; see 1 NY PJI2d 5), it was not objected to on that ground and, in any event, on the record and in the context in which spoken would not be ground for reversal (Dolan, supra).

. The weakest links in his defense were his inability to explain how Ms. Calero’s son obtained bananas and the absence of any gun when the police arrived. Yet the evidence did not foreclose a jury finding that the bananas were dropped elsewhere than at the robbery scene and it was not beyond the realm of possibility that, as defendant's attorney sought to suggest, Ms. Calero, to protect Cruz, who had come to her aid, from difficulty over his possession of a gun, had taken the gun with her when she went upstairs. Indeed, since Ms. Calero lost sight of the three robbers as they went around the corner of the building and did not see Cruz until he called to her that he had “one of them”, it is not beyond possibility that Cruz was one of the three robbers but was quick thinking enough to accuse defendant who, as he claimed, was simply walking home through the courtyard. Ms. Calero’s testimony that she heard no shots is inconsistent with that thesis, but Ms. Taylor’s adamant insistence against searching cross-examination that she heard shots and the presence of the police in answer to a “shots fired” run suggest that Ms. Calero’s testimony may not have been accurate. The point is not that these suggestions would be found by a jury unaffected by the prosecutor’s improper conduct but that the evidence presented the jury with a very real enigma. Indeed, the jury reported itself unable to agree and was given an “Allen” charge before it finally reached a verdict.

. I do not pause to consider whether by so doing he gave “ ‘standing to the statement [conduct] of the District Attorney as legitimate argument [tactics] ’ ” (People v Ashwal, 39 NY2d 105, 111, supra), for even if not, reversal would be required on this record.

. In light of footnote 2 to the majority opinion I note that however the conduct of defendant’s attorney be characterized, it did not include seven material misstatements of the evidence. To encourage that kind of conduct by affirming is, in my view, egregious error.