THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
KENNETH JOHNSON, Appellant.

Fourth Department, June 2, 1978

## APPEARANCES OF COUNSEL

*James P. Harrington* for appellant.

*Edward C. Cosgrove, District Attorney (Judith Manzella* of counsel), for respondent.

## OPINION OF THE COURT

MOULE, J.

At approximately 11:45 A.M. on Saturday, November 29, 1975, complainant was robbed, raped, and twice sodomized at gunpoint in a stairwell of the Ellicott-Goodrich parking ramp in the vicinity of the Buffalo General Hospital. The attack on complainant lasted for 10 minutes, during which she had an opportunity to view her assailant under good lighting conditions. In the course of events, complainant was directed to produce her driver's license by the assailant, who squinted noticeably while he examined it. Immediately after the attacker fled, complainant reported the incident to a security guard at the hospital, giving him a brief description of her assailant as a Black male, six feet to six feet two inches in height, of a thin build, wearing a goatee, and dressed in a navy blue or black middy coat.

The following Monday, December 1, 1975, complainant gave a statement to the Buffalo police in which she described the man who attacked her as about 29-30 years of age, having broad shoulders with a slender build, big hands with long fingers, and as presenting a retarded expression in that his lip seemed to droop. The assailant's clothing was described to police as dark navy green plaid slacks, an olive green T-shirt with a blue check flannel shirt over it, a dark knee-length coat with a silky lining and a navy blue knit cap.

Two days later, on December 3, 1975, the police conducted

two lineups in which defendant was included.[1] Complainant identified defendant as her assailant in both lineups, as a result of which he was arrested and subsequently charged with one count each of robbery and rape and two counts of sodomy. At trial,[2] complainant again identified defendant as her assailant. The record shows that defendant was 25 years old at the time of the crime and that he was six feet tall and of slim build. Moreover, defendant's optometrist testified that defendant's vision was highly myopic, so that upon reading the printed matter on a driver's license without glasses, defendant would involuntarily squint. Defendant claimed that complainant was mistaken in her identification and presented an alibi defense, taking the stand in his own behalf. The jury weighed the conflicting testimony and returned a verdict of guilty on each of the counts.

Defendant first contends that the court improperly excluded the testimony of the 23-year-old woman who had been robbed and raped on Friday, November 28, 1975, the day before complainant was attacked. Defendant claims that he should have been permitted to show through this woman the details of the attack made upon her in a parking garage located underneath a downtown Buffalo shopping mall; the description of her attacker; that she was responsible for the construction of the composite picture resembling defendant which appeared in local newpapers over the Thanksgiving weekend; that she observed defendant at one of the lineups held on December 3, 1975; and that defendant was not the person who attacked her. The trial court ruled that this testimony was irrelevant. It was within the discretion of the court to determine the relevance of this offer of proof *(People v Warner,* 52 AD2d 684) and we hold that the court's discretion was properly exercised.

---

1. Defendant's presence at these lineups had been secured as the result of a report to police by a security guard at the Community Mental Health Center where defendant was employed. The guard, having previously known defendant, observed a similarity between his facial appearance and that of a composite photograph published in a local newspaper over the Thanksgiving weekend. The composite had been prepared by the 23-year-old victim of a rape and robbery which occurred in a parking facility under the Main Place Mall in downtown Buffalo on November 28, 1975.

2. This was the second trial on the charges arising out of the rape, robbery and sodomizing of complainant on November 29, 1975. The first trial resulted in a mistrial. The jury in the first trial acquitted defendant of the robbery and rape of a 25-year-old woman in a separate incident occurring on November 27, 1975, Thanksgiving Day, in the vicinity of Jefferson Avenue on Buffalo's east side.

■■ For evidence to be relevant, it must tend to convince that the fact sought to be established is so *(People v Yazum,* 13 NY2d 302, 304). The factual issue at trial was the identity of the man who robbed, raped and sodomized complainant. Testimony of another victim concerning another robbery and rape committed in a different manner at another location, and on a different date, that defendant was not the man who attacked her, had no probative value in determining whether defendant robbed, raped and sodomized complainant in this case. Consequently, the proffered testimony was irrelevant.

■ Furthermore, although the proffered testimony was relevant to disprove defendant's identity as a robber and rapist on a different occasion, that identification was neither in issue at this trial nor probative of a fact in issue. Accordingly, it was immaterial (see Richardson, Evidence [10th ed], § 4). There was no proof that the same man was responsible for the sexual attack on complainant and the prior rape of the woman whose testimony was sought to be introduced; there was only speculation by police based upon similarity of descriptions given by the victims, use of a gun in each instance and the occurrence of both incidents in parking facilities. These circumstances are not sufficiently unique to provide a basis for admitting collateral testimony concerning a prior rape.

The prosecution introduced neither the composite photograph constructed by the victim of the attack occurring on the day before the incident involving complainant, nor any evidence concerning the identity of the perpetrator of that crime. Lacking such proof, there is no basis at all for admitting the testimony of the victim of the earlier crime. To admit the testimony of a victim of a separate attack regarding the circumstances under which it took place and the description of the perpetrator of that uncharged crime would create a shattering precedent. As a result, Trial Judges would be required to consider whether circumstances surrounding crimes similar to that for which a defendant is being tried are such that the victim of the other crime may be called as a witness by a defendant. The dissent offers no authority for establishing such requirement and we see no reason to create one.

Defendant contends secondly that misconduct on the part of the prosecutor, Assistant District Attorney Albert M. Ranni, requires the granting of a new trial.

■ This court is ever mindful of the right of every person

accused of crime to have a fair and impartial trial before an unbiased court and an unprejudiced jury *(People v De Jesus, 42 NY2d 519, 523 People v Crimmins, 36 NY2d 230, 238)*. This right is to be accorded in surroundings where the accused and the prosecution enjoy the unfettered attention of the jury, to the end that the resulting verdict will be the product solely of evidence adduced on the witness stand *(People v De Jesus, supra,* p 523). Although every trial may not be impeccably conducted and free of some error, trials should not be tolerated where unadulterated unfairness and deceit have become the rule *(People v Alicea,* 37 NY2d 601, 605).

While we must express our concern with the misconduct of Mr. Ranni throughout the course of the trial, nevertheless, we cannot say that his conduct so impaired the development of the factual issues and the presentation of testimony as to jeopardize the fairness of the trial *(People v Alicea, supra,* p 603).

The record shows that complainant's identification of defendant as her assailant was positive, both at two lineups and at trial. Despite a lengthy cross-examination, her testimony, including the description of the rape and her forced involvement in oral and anal sodomy, was unequivocal. In addition, defendant admitted being alone in the parking ramp where complainant was raped at about the time the attack took place. The Community Mental Health Center, at which defendant was employed, is located across the street from the ramp. Defendant testified that he entered the ramp only briefly to get his car in order to pick up a female co-worker for lunch. The security guard at the Community Mental Health Center, however, stated that this co-worker told him that she and defendant went to lunch some time after 12:00 P.M., subsequent to the time that the attack on complainant had occurred. Furthermore, this security guard said that he had observed defendant jumping from a "porthole" in the ramp at 12:15 P.M. or 12:20 P.M. approximately 20 minutes after complainant's attack had been reported.

In light of the strong identification testimony of complainant, the fact that defendant was concededly in the area of the crime when it occurred, the proof that defendant was seen exiting the parking ramp shortly after the attack, and the other evidence refuting defendant's claim that he was elsewhere at that time, we do not believe that the prosecutor's misconduct is a ground for reversal.

We have examined defendant's remaining contentions and find them to be without merit.

Accordingly, the judgment of conviction should be affirmed.

HANCOCK, JR., J. (dissenting). We would reverse and grant a new trial on two grounds:

1. The court erred in excluding relevant exculpatory evidence offered to explain the People's proof and to establish the defendant's contention that the complaining witness had mistaken the defendant for someone else who closely resembled the defendant; and

2. The defendant was deprived of a fair trial by the highly improper, overreaching and prejudicial conduct of the prosecuting attorney which persisted throughout the proceedings.

I

The defendant, a 27-year-old Black male, was convicted on June 22, 1977 of robbery in the first degree (Penal Law, § 160.15), rape in the first degree (Penal Law, § 130.35), and two counts of sodomy in the first degree (Penal Law, § 130.50) for acts allegedly committed shortly before noon on November 29, 1975 in a parking garage in downtown Buffalo upon a 23-year-old white woman named Deborah Richards. It was defendant's second trial on the charges concerning Deborah Richards, the first trial on these charges having culminated in a jury disagreement and a mistrial on April 22, 1977. The earlier trial had also involved similar rape and robbery charges against the defendant arising out of acts he allegedly committed on November 27, 1975 in a different parking garage in downtown Buffalo upon another young white woman, Eileen Murphy. The defendant was cleared of the Murphy charges by verdicts of not guilty on all counts.

Defendant testified in the second trial, as he had in the first, that he was innocent; that he did not see Deborah Richards on November 29, 1975; that he had never seen her at any time prior to his arrest on December 3, 1975; and that when the crime was allegedly occurring in the parking garage, he was across the street at the Community Mental Health Center, his place of employment. The defendant conceded, however, that he entered the parking garage at approximately 11:40 A.M. in order to get his car to go out on his lunch hour, and that he returned to the parking garage at 12:50 P.M., after his lunch hour. On both trials, defendant swore several co-workers as

witnesses who testified to his whereabouts at various times during the morning and early afternoon of November 29, 1975. He has steadfastly maintained throughout the proceedings that Deborah Richards, the complaining witness, was mistaken in her identification of him as her assailant.

This appeal presents the question of whether the trial court committed reversible error in refusing defendant's offer of assertedly relevant evidence bearing directly on the central issue in the case: whether the identification of defendant by the complaining witness, Deborah Richards, was a mistake.

A brief description of the chain of events which preceded the apprehension and indictment of the defendant is necessary. On November 27, 28, and 29, 1975, the Buffalo police received reports of three separate rape-robberies committed in downtown Buffalo upon three young white women. In all three cases, some or all of the criminal activities occurred in parking garages, the assailant robbed and raped the victims at the point of a gun, and the victims described the attacker as a tall, thin, Black male, wearing a black or navy blue pea coat and a dark colored or blue knitted cap.

On Thursday, November 27, 1975, Thanksgiving Day, at about 8:00 P.M., Eileen Murphy, age 25, was accosted by a man with a gun as she drove her car into the garage at her house on Bryant Avenue. The man entered the car and ordered her at gun point to drive to the top ramp of the Sears parking garage. He told her that she had nothing to be nervous about and that he was not going to hurt her if she did what he told her. She drove to the garage, found that it was closed, and then, at his direction, drove over several other streets to a place where he made her stop the car and raped her. He took $11 from her wallet. She described her attacker as a Black male, at least six feet tall, thin build, wearing a navy blue pea coat and a dark ski hat, "medium complected," with a large nose and big nostrils, fairly large lips, and whiskers.

At approximately 11:00 A.M. on Friday, November 28, 1975, Charlene Kita, age 23, was raped and robbed at gun point in the parking ramp of Main Place Mall in downtown Buffalo. Her assailant stated, "Don't scream, I don't want to hurt you." She described him to the police as a "black male, 6'2" or 6'3", thin," wearing a "navy blue long pea coat, blue jeans, rust-colored shoes and a blue knit hat."

Deborah Richards, age 23, the complainant, was attacked on Saturday, November 29, 1975, sometime before noon in the

parking ramp at Ellicott and Goodrich Streets in downtown Buffalo. Her assailant said, "Please don't scream, I won't hurt you. Just do what I say, and everything will be alright." At the point of a gun, she was forced to submit to acts of sodomy, raped, and robbed of the money in her purse. Deborah Richards stated that the man who attacked her was Black, tall, about six feet one inch or six feet two inches, slender, with broad shoulders, wearing green and blue plaid pants, a blue checked flannel shirt with a green T-shirt underneath, a dark navy pea coat reaching to below the knees with a silky lining, and a navy blue knit watch cap. He was 29 or 30 years old, had big hands, long fingers, a goatee, droopy lips, and a "dumbfounded" or "retarded" expression.

Because of the remarkable similarity in the details of the crimes and in the descriptions given of the perpetrator by the victims, the investigating officers theorized that the Murphy, Kita, and Richards rape-robberies had been performed by one man. Based upon the description of the assailant given by Charlene Kita and under her direction, the police prepared a composite photograph of the suspect which was published in the Buffalo newspapers.

The Black male portrayed in the composite[1] (a picture pieced together from numerous photographs) bears a striking resemblance in facial features and contours to the defendant who, it appears, was 25 years of age at the time, six feet tall, and of slim build. When the composite photograph was published in the *Buffalo Courier Express* over the Thanksgiving weekend, it was observed by Gordon Plant, a security guard at the Community Mental Health Center where the defendant worked. Plant noticed the similarity between the composite photograph and the defendant and recalled that he had seen the defendant emerging from the parking garage on November 29, 1975, at some time in the early afternoon, after the Deborah Richards attack had been reported at 11:55 A.M.

It should be noted, however, that Plant was certain that Johnson was not wearing clothes matching those worn by the assailant as described by Deborah Richards. Plant testified that when he saw Johnson on November 29, he had on "a little light fall jacket * * * [and that] he didn't have no * * * pea jacket." Plant's statement was corroborated by those of

---

1. The composite photograph was identified and admitted as an exhibit in the *Wade* suppression hearing.

alibi witnesses Jeannie Neyer and Yvonne Bradley, both of whom testified that defendant had on a short black leather jacket that day.[2]

On Tuesday morning, December 2, 1975, Plant reported his observations to the police. Later that day both Eileen Murphy and Deborah Richards identified the defendant as their assailant from photographs of the defendant.[3] On the following day, December 3, 1975, the defendant was presented to Eileen Murphy, Deborah Richards and Charlene Kita in two separate lineups. From each lineup, Eileen Murphy and Deborah Richards picked out the defendant as the assailant.[4] However, Charlene Kita, who had been primarily responsible for the preparation of the composite photograph, was certain the defendant was not the man who had attacked her.

In proceedings before the commencement of the trial, defense counsel renewed the offer of proof made and rejected by the court on the first trial, viz., that he be permitted to show through Charlene Kita the details of the attack upon her in the Main Place Mall parking ramp on November 28, 1975; the description of her attacker; that she was the person principally responsible for the construction of the composite picture which appeared in the newspapers; that the composite was seen both by Deborah Richards and Eileen Murphy who found the general appearance to be the same as the man who attacked them; and that she observed the defendant at the

2. Neyer stated: "What I do recall is his jacket * * * It was dark leather waist length; it had stitching * * * [and I] didn't notice any change [in defendant's dress at 1:00 p.m. that day]." Bradley stated: "I remember he had on some black cork wedge-heeled shoes, a black waist jacket—a black leather jacket." Also, defendant's description of his dress that day conflicts in several particulars with Richard's description of her assailant's dress, viz., "light gray * * * slacks", not "navy blue and green plaid slacks"; "a black flower-print shirt with red flowers on it", not "a green T-shirt, and a blue checkered shirt over that, flannel shirt"; "a pair of black wedge-heeled shoes", not "pointed shoes"; and "a black waist-length jacket", not "a pea coat below-the-knee length with a silky lining inside.'

3. It appears that after Deborah Richards made the initial identification from an array of photographs, the police showed her two additional photographs of the defendant.

4. In her statement to the police after the assault, Richards did not mention her assailant's protruding forehead, medium complexion, large eyes, wide nose, big nostrils or hair on the upper lip, all of which, it appears, she related for the first time at some point after she had had an opportunity to observe defendant in the lineup and in various pretrial hearings. Further, Richards omitted any mention of defendant's missing teeth until redirect examination at the trial, despite specific questioning concerning his teeth at the *Wade* hearing. Finally, defendant is very near-sighted and stated that he wears glasses "all the time." Richards' assailant had no glasses.

lineup on December 3, 1975, and that "the defendant definitely was not the person who attacked her." The court ruled that such testimony was irrelevant and denied the request. In our opinion, this was error.

It is an established "principle, basic to our law of evidence, that 'All facts having rational probative value are admissible' unless there is sound reason to exclude them, unless, that is, 'some specific rule forbids' (1 Wigmore, Evidence [3d ed., 1940], p. 293). It is this general principle which gives rationality, coherence and justification to our system of evidence". *(Ando v Woodberry,* 8 NY2d 165, 167; Richardson, Evidence [10th ed], § 5.) Relevant evidence has been defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed Rules of Evidence, rule 401; Richardson, Evidence [10th ed], § 4.) It may be said that whatever evidence is to the ordinary mind logically probative of a fact in issue, is relevant, and prima facie admissible (21 NY Jur, Evidence, § 162).[5]

Here the ultimate fact in issue was the identity of Deborah Richards' assailant: was it or was it not the defendant? The only evidence directly probative of that ultimate fact was the testimony of the victim, Deborah Richards, who stated from her observations and her recollection that the defendant was the man who attacked her. Defendant challenges the reliability and accuracy of this testimony and asserts that the witness was mistaken in her identification; that it was not he whom she observed but another man who closely resembled him in size, build and facial appearance, and who, unlike defendant, was without glasses and wearing clothes which matched the description given by Deborah Richards, including a navy pea coat and navy knitted cap. Proof that there was, in fact, such a man; that the man had committed a crime in a parking garage in downtown Buffalo on November 28, 1975, identical in many respects to that allegedly committed by defendant on November 29, 1975; that the physical description of this man

---

5. "Strictly speaking the test of whether a given bit of testimony is relevant or irrelevant should be one of logic rather than law, but like most of the rules of evidence, those relating to the subject of relevancy have grown from judicial decision. In general it may be said that any evidence that tends to show the existence or nonexistence of certain alleged essential facts which must be proved or disproved is relevant. Stated differently, it may be said that whatever evidence is, to the ordinary mind, logically probative of a fact in issue, is prima facie admissible." (21 NY Jur, Evidence, § 162.)

and the description of the clothes he wore closely matched the description given by the complaining witness of her assailant; and that the facial characteristics of the man so closely resembled those of the defendant that a composite photograph based on a description of the man was recognized as a picture of the defendant; all would tend to establish defendant's contention that Deborah Richards had indeed confused him with this man.

Such evidence was relevant not because it showed that the defendant had been suspected and later cleared of the other crime, but because it established facts countering the force of the People's evidence against defendant by tending to explain it away and by showing the existence and probability of another hypothesis, i.e., that it was not the defendant whom Deborah Richards saw, but another tall, thin Black male dressed in a long navy pea coat and blue watch cap who looked like the defendant and who was known to have been committing crimes similar to the one defendant was charged with, in the same area and during the same time period (1 Wigmore, Evidence [3d ed], §§ 34, 36; 2 Wigmore, Evidence [3d ed], §§ 411-412).[6] Because the proof of such explanatory hypothesis had probative value as tending to disprove the ultimate fact in issue (the identity of the defendant) it should have been admitted (Richardson, Evidence [10th ed], § 5). By excluding the evidence (evidence, it should be noted, that was developed not by defendant but as a byproduct of the prosecution's efforts to tie the defendant to the Murphy and the Kita rape-robberies), defendant was deprived of his only means of giving factual substance to his claim of mistaken identity. That defendant could not establish the identity of the unknown assailant or prove definitely that there was a link between the Kita rape-robbery and the Richards attack does

---

6. In section 34 Wigmore wrote:

"Thus every sort of evidentiary fact may call for treatment in two aspects: 1. What is the extent to which other hypotheses must be excluded before the fact is admissible? 2. What are the other hypotheses which are then available for the opponent as explaining away the force of the fact thus provisionally admissible?

"This second aspect of each class of facts will hereafter be treated usually, for the respective subjects of Relevancy, under the head of Explanation. To illustrate:

"Ex. 1. In showing the defendant's connection with a murder, the fact is admitted of the finding of a knife, bearing his name, near the body of the deceased; the defendant, to refute the claimed conclusion that he was present with the knife at the murder, will be allowed to show that he lost the knife a month before; thus giving greater color of probability to the hypothesis that some one else was present with the knife."

not make it irrelevant or inadmissible. For the evidence does establish conclusively the existence of a person other than the defendant who could with reasonable probability have been the man who attacked Deborah Richards and whom she might have mistaken for the defendant. For evidence to be admissible, " '[g]enerally speaking, all that is necessary is that the evidence have relevance, that it tend to convince that the fact sought to be established is so. That it is equivocal * * * does not render it inadmissible' *(People v Yazum,* 13 NY2d 302, 304). *Any evidence which is helpful in getting at the truth of the material issue is relevant even though it is only a link in the chain of facts which must be proved to make the proposition at issue appear more or less probable* (Wharton, Criminal Evidence [13th ed], § 151)." *(People v Warner,* 52 AD2d 684, 685; emphasis supplied.) Inasmuch as the offered proof was relevant as bearing on the ultimate question of defendant's identity, it should have been admitted unless barred by some exclusionary rule (Richardson, Evidence [10th ed], § 5).

*People v Fiore* (34 NY2d 81) and *People v Molineux* (168 NY 264), cited by respondent as authorities for denying defendant's offer of proof, are off the point. *Fiore* and *Molineux* deal not with the relevance and admissibility of exculpatory evidence, offered by defendant to explain away the People's proof, but with the exclusion, except in narrowly limited circumstances, of evidence of prior crimes offered by the prosecution to establish the defendant's guilt. The reason for excluding such evidence except where there exists "a single inseparable plan encompassing both the charged and uncharged crimes" *(People v Fiore, supra,* p 85) is not that the proof is irrelevant, "because on the contrary the evidence is often logically relevant. The rule rests on grounds of policy in the criminal law" *(People v Fiore, supra,* p 85), i.e., that there is a danger "that a jury might convict not for the crime charged, but because, as evidenced by other criminal conduct, the accused is a person deserving of punishment". *(People v Fiore, supra,* p 84.)[7]

Although, in our opinion, the court erred in excluding relevant exculpatory circumstantial evidence, we by no means suggest that evidence of similar crimes committed by other

---

7. But see *People v Allweiss* (61 AD2d 74) in which the court held that evidence that the defendant had committed six other rapes, all having the same distinguishing characteristics as the crime with which defendant was charged, was admissible to identify the defendant as the perpetrator of the crime charged.

persons resembling an accused should be admitted in every criminal case where the issue is identification. Such evidence, even though relevant in a technical sense, should be excluded if it is too slight, remote or conjectural to have any legitimate influence in determining the fact in issue (Richarson, Evidence [10th ed], § 147). Thus the court might properly, in the exercise of its discretion, exclude such evidence, where, for example, no clear-cut issue as to the identification has been created (as it has in the case at bar by the testimony of the defendant, the witness Plant concerning defendant's clothes, and the alibi witnesses); or where the proof of the existence of the other person is conjectural or based on hearsay; or where there is lacking in the offered proof those elements (such as the high degree of similarity in the descriptions given of the assailant and his clothing and in the distinguishing characteristics of the crimes and the proximity of the events, geographically and in time) from which it can be said there was a reasonable possibility that the complainant had confused the defendant with another person about whose existence there could be no doubt. No general rule can be established covering such proof; for the decision as to its relevance and admissibility must be made by the court upon the facts of each case (Richardson, Evidence [10th ed], § 147).

We would hold, therefore, that, on the unusual facts presented, the court erred in excluding relevant circumstantial evidence offered to explain the People's proof (1 Wigmore, Evidence [3d ed], §§ 34, 36; 2 Wigmore, Evidence [3d ed], §§ 411-412). In this closely contested case one jury has been unable to decide that it was the defendant who robbed and raped Deborah Richards. That jury, in acquitting the defendant of the Eileen Murphy charges, presumably decided that the man who attacked Eileen Murphy under circumstances similar to those in the Richards attack—a man who closely resembled the defendant and who, Eileen Murphy believed, was the defendant—was in fact not the defendant but someone else. Considering all of the evidence, it seems distinctly possible that the defendant was mistaken by Deborah Richards for another person. Because the excluded proof would have given factual substance to defendant's claim of mistaken identification, we cannot say under all the circumstances that if it had been admitted, there is not a significant probability that the verdict would have been an acquittal (People v Crimmins, 36 NY2d 230, 240, 242). The judgment should therefore be reversed.

## II

We would also reverse upon another ground: that the record is so permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney that the defendant was deprived of a fair trial (People v Alicea, 37 NY2d 601; People v Bussey, 62 AD2d 200; People v Balsano, 51 AD2d 130; see Code of Professional Responsibility, EC 7-13, McKinney's Cons Laws of NY, Judiciary Law, p 474). The frank concession by the District Attorney of the impropriety of certain of the actions complained of makes a complete recitation unnecessary. We must record our particular disapproval, however, of the gratuitous comments made repeatedly, without any basis, during the course of the testimony of defense witnesses that their testimony had been "sugared up", that the "response was staged", the "answer rehearsed" or "on the tip of her tongue."

The prosecutor devoted almost 40 pages of trial transcript of his 175-page cross-examination of the defendant to an inordinately lengthy and repetitious questioning of the defendant (continued despite repeated objections which were sustained) concerning the details of misdemeanor convictions for possession of marihuana, marihuana paraphernalia, and a .22 caliber pistol. There were repeated attempts in this examination to show that the defendant had lied when he pleaded not guilty to these charges and then later admitted guilt. Such tactics were highly improper, as was the prosecutor's comment, regarding the not-guilty pleas, on summation:

"Now, the mere assertion of innocence isn't proof. You know now that this assertion, this claim is often made by guilty people to avoid justice. The defendant himself raised this claim on prior occasions: other crimes—not rape crimes—other crimes; pleaded not guilty.

"MR. BERMINGHAM: Objection: that is improper argument, and to contrast a legal plea of not guilty to a sworn testimony, is improper—not evidence; not before the Court.

"THE COURT: I'll sustain the objection because it's a—sustain the objection. (Whereupon, the summation of Mr. Ranni was resumed.)

"MR. RANNI: In any event, Johnson claims she's wrong. Easy to say. Very easy to say."

We must also note our disapproval of the prosecutor's tactics in asking irrelevant questions of the defendant which

had no legitimate bearing on the question of defendant's credibility and which were obviously asked for their prejudicial effect,[8] such as:

"Q. Now, do you recall telling the judge in a prior proceeding—admitting to him that you called the arresting officer that arrested you a 'motherfucker'?

MR. BERMINGHAM: Objection. * * *

THE COURT: Objection sustained."

The several references in the prosecutor's summation to defense counsel as "Dr. Hocus Pocus" and other disparaging personal remarks calculated to impair his credibility—such as: "he's not under oath * * * the D.A. is not going to prosecute for perjury"—were uncalled for and contrary to the Canon of Professional Ethics that a lawyer "should not make unfair or derogatory personal reference to opposing counsel." (Code of Professional Responsibility, EC 7-37, McKinney's Cons Laws of NY, Judiciary Law, p 485; see *id.,* EC 7-38.)

The overly repititious examination on the marihuana possession convictions (admitted by defendant on his direct examination) which was designed, without foundation in fact, to portray the defendant as having engaged in hard drug traffic and as having committed crimes far more serious than the misdemeanors was also improper and should not have been allowed *(People v Burgess,* 50 AD2d 1036, 1037).

Although there was no objection to some of the questions and comments on the subject, the court should not have permitted over objection the extensive and repeated efforts by the prosecution on cross-examination and in summation to impeach the alibi witnesses as poor citizens for their failure to co-operate with the District Attorney. (See *People v Mandel,* 61 AD2d 563; *People v Mims,* 59 AD2d 769; *People v Hamlin,* 58 AD2d 631.)

From the record there clearly emerges the picture of an

---

8. The same effort to prejudice the defendant in the eyes of the jury by asking completely irrelevant questions was employed in the cross-examination of defendant's character witnesses. Example:

"Q. Do you know how many children Mr. Johnson has; have you heard about that?

"A. I think one or two.

"Q. Do you know how many women he has as the mother of these children?

"A. No.

"Mr. Bermingham: Your Honor, I object to this. First of all, it has nothing to do with truthfulness, honesty, peacefulness, gentleness. Just—

"The Court: I'll sustain the objection."

overbearing prosecutor obsessed with the idea of obtaining a conviction at all costs, ignoring the court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and to destroy his credibility with the jury.

In *People v Alicea* (37 NY2d 601, 605, *supra*) Judge GABRIELLI wrote: "Criminal trials are to be so conducted that the proof will be legal evidence, unimpaired by intemperate conduct, impertinent counsel and irrelevant asides, all of which obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence. Although every trial may not be impeccably conducted and free of some error, we will not tolerate trials where unadulterated unfairness and deceit have become the rule. Evenhanded justice requires more and, as the ultimate guardian of the rights of the People and defendants in the State, we have a right to expect more." The standard in *Alicea* has not been met. We agree with the majority that this was an emotional case involving serious charges. In our opinion, however, in view of the previous jury disagreement, the steadfast denial of guilt by defendant, the discrepancies between defendant's appearance and dress and that given of the assailant, and the possibility of mistaken identification, proof of guilt was anything but overwhelming. The admitted prosecutorial misconduct could well have made the difference between acquittal and conviction and compels a reversal.

The judgment should be reversed and a new trial granted.

MARSH, P. J., and SIMONS, J., concur with MOULE, J.; HANCOCK, JR., and WITMER, JJ., dissent and vote to reverse the judgment and grant a new trial, in an opinion by HANCOCK, JR., J.

Judgment affirmed.