THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY BARNES, Appellant.

Fourth Department, July 12, 1985

**APPEARANCES OF COUNSEL**

*Rose H. Sconiers* (*Charles Halvorsen* of counsel), for appellant.

*Richard J. Arcara, District Attorney* (*J. Michael Marion* of counsel), for respondent.

**OPINION OF THE COURT**

HANCOCK, JR., J. P.

After his second jury trial on charges stemming from a stabbing death in Buffalo, defendant was convicted of felony murder, robbery, first degree, and criminal possession of a weapon, fourth degree. He was acquitted of intentional murder. The first trial had ended in a hung jury. Of several contentions raised on appeal, we address one which, in our opinion, requires a reversal and a new trial: that the court erred in excluding the testimony of a disinterested defense witness, April Edwards, concerning her observations — made about the time of the crime — of a man not resembling defendant running from the vicinity of the stabbing carrying a knife. The People, citing *People v*

*Johnson* (47 NY2d 785, 787, *cert denied* 444 US 857), argue that the court properly exercised its discretion in refusing the offer of proof as speculative because of the proof's assertedly tenuous connection with the crime. Defendant, however, contends that the testimony was relevant as proof of an exculpatory hypothesis for the crime as an alternative to the theory advanced by the People and also as proof supporting his own testimony, and, he argues, the court's exclusion of it deprived him of a fair trial. A discussion of these contentions requires a detailed examination of the evidence against defendant and of defendant's testimony and the offered proof which was excluded.

I

At 6:38 P.M., on October 4, 1980, police arrived at the scene of a robbery and homicide near Chippewa and Pearl Streets in Buffalo. Someone had robbed Terrence Mills and stabbed him in the left chest with a knife. Mills died from loss of blood. The chief witnesses to the events surrounding the crime were four young men: defendant, Larry Barnes, then age 19, and Emmett Boyd, Mitchell Edwards and Melvin Speaks, then ages 19, 17 and 22, respectively. The four were well acquainted and defendant and Speaks shared an apartment at 1711 Main Street. In their trial testimony, all agreed that they were together at various times on October 14. There was agreement on little else. Boyd and Edwards testified against defendant as eyewitnesses to the crime and Speaks testified to incriminating statements made by defendant and to his possession of the fruits of the crime and the knife he allegedly used. Defendant denied participation in the crime and testified to inculpatory declarations by the other three.

According to their testimony, Boyd and Edwards, who had not been together on the day of the crime, arrived simultaneously at different vantage points near Pearl and Chippewa Streets where they were able to observe defendant's actions and hear what he said. Boyd saw defendant talking to a man and heard defendant say, "Give me your money." The man responded, "This is all I have." Boyd then saw defendant stab the man in the chest. Edwards testified that he saw defendant walk up to a man and heard him ask for money. The man replied that he had only $27 or $28 and gave defendant his wallet. Defendant, according to Edwards, then stabbed the man in the chest.

Boyd testified that on that afternoon he had been drinking rum and beer with defendant at the apartment on Main Street before he and defendant left for downtown on foot so that defendant could sell a sweater. As they neared the intersection

of Pearl and Chippewa Streets, defendant speeded up and disappeared around the corner on Pearl ahead of Boyd. Just as he turned the corner, Boyd witnessed the events he described. After the stabbing Boyd ran behind defendant in the direction of the Statler Hotel and, after losing sight of him, returned to the scene. The victim was dead. Boyd lied to police and reporters to protect defendant (who is black, very tall, and nicknamed "Too Tall"), telling them that the man who killed the victim was a short white man.

Edwards testified that in the late afternoon of October 14 he met a woman named Kim who drove him to the Pearl-Chippewa Street area to get a pizza. When they got out of the car Edwards saw defendant and — about 20 feet behind him — Boyd. He "called to them" but they did not answer. After witnessing the stabbing Edwards got back in the car and Kim drove him to his mother's home on Lafayette Street where he lived. Shortly thereafter, alone and on an errand for his mother to pick up a prescription, he met up with defendant on Lafayette Street. Defendant was in the act of "going through a wallet" and ripping up papers and throwing them on the ground. Edwards joined him and the two proceeded together to a liquor store, a pizza shop where they placed an order for pizza, and to the pharmacy (the pharmacist testified that Edwards picked up the prescription at about 7:00 P.M.). After stopping to pick up the pizza and dropping off the prescription at Edward's mother's house, they went directly to the Main Street apartment, which defendant unlocked with a key which he had. The next day Edwards told police that he knew nothing about the stabbing. On the following day police arrested Edwards and he, apparently fearing that he would be charged with the murder, gave a statement consistent with his trial testimony. He testified that while defendant was rifling the wallet he [Edwards] picked up Mills' Blue Cross card and that he burned it a day later.

Speaks said that he was at the Main Street apartment until 6:00 or 6:15 on the day of the crime when he went to the home of a girlfriend and fell asleep. At 7:30 he woke up when defendant arrived. Defendant told him that he had mugged someone and asked for the key to the apartment on Main Street. When Speaks returned to the apartment at about 8:00 P.M., defendant and Edwards were already there, and Boyd arrived a short time later. Defendant, who was playing with a knife, announced that he had stabbed someone. He showed the others credit cards bearing the name Terrence Mills, some of which Speaks took and, later, threw into a storm drain. Defendant, Speaks said, threw the knife into a storm drain the next day. Boyd and

Edwards also testified that while at the apartment defendant was playing with a knife and made statements admitting the stabbing.

It is evident that the testimony of the three main prosecution witnesses is not free from doubt. There are inconsistencies. For example, Speaks said that defendant came to Speaks' girlfriend's house at 7:30 to get the key to the Main Street apartment from Speaks. Edwards, on the other hand, said that he was with defendant from sometime before 7:00, that they went to the pharmacy, pizza shop, liquor store, and Edwards' house, that they then, without stopping anywhere else, went to the Main Street apartment, and that defendant used a key which he had to unlock it. Also, while Edwards said that he saw Boyd and defendant at the scene of the crime and was close enough to hear what defendant said to Mills, Boyd, who was also close enough to hear the exchange between defendant and Mills, said that he never saw Edwards. The testimony of all three is contrary to statements given on other occasions: Boyd at first gave police a false description of the killer; Edwards in his first account to police said that he knew nothing about the crime; and Speaks told the Grand Jury that defendant had told him that Edwards held the victim during the crime.

While perhaps not legally accomplices, all three were implicated to some degree in the crime and had motives to lay the blame on defendant. Edwards and Speaks both admittedly destroyed or concealed evidence. Boyd and Edwards were present at the scene and both were arrested after the crime. Boyd said that he "struck a deal" with the prosecution that felony charges against him arising from the initial false statement would be dropped if he testified against defendant. And, Edwards testified, it was not until police arrested him and told him "to tell the truth or * * * [he] was going to get into trouble" that he gave them the statement accusing defendant of the murder.

In his testimony at the first trial, which was read into evidence, defendant stated that on October 14 he was with Boyd, Edwards and Speaks in the area of Chippewa Street. When the others began to talk about robbing someone, defendant left and went to the apartment on Main Street to sleep. He woke up later when he heard Speaks and Edwards talking loudly in the next room saying "something about they shouldn't have ripped this guy off, and what happened to Emmett [Boyd]." Boyd came in a few minutes later and asked the other two why they had left him. He said that "the guy had died downtown".

The excluded evidence in issue was the testimony of April Edwards, a disinterested witness and no relation to Mitchell Edwards. As an offer of proof defense counsel read into the record the statement she had given to the police on the day of the murder.[1] In it she said that she left her hotel room at about 6:05 P.M. to go to the submarine and pizza shop on Pearl Street near Chippewa. When she got there she started to get coffee but discovered that she didn't have enough change. She went back outside and "waited on the corner of the Sub Shop". She was "just standing there" when suddenly a black man with a knife in his hand "came running after [her]"; she ran back to her hotel. A short while later from her hotel room window she saw police cars and ambulances and went downstairs where she learned that someone had been stabbed. The man who had "run after" her was thin and 5 feet 6 inches tall. Defense counsel pointed out that defendant was 6 feet 4 inches tall and argued that the statement was relevant because it placed a black man not the defendant in the area with a knife at about the time of the crime. Moreover, he asserted, Speaks, who, according to defendant's version, was involved in the crime, was 5 feet 5 or 5 feet 6 inches tall, the same height as the man seen by April Edwards. The court ruled that although defendant could call the witness, it would exclude her testimony concerning the incident because it was "too speculative and call[ed] for conjecture."

## II

In our analysis of whether the offered proof was properly rejected, it is "well to recall the principle, basic to our law of evidence, that 'All facts having rational probative value are admissible' unless there is sound reason to exclude them, unless, that is, 'some specific rule forbids' (1 Wigmore, Evidence [3d ed., 1940], p. 293)" (*Ando v Woodberry*, 8 NY2d 165, 167). Generally speaking, whatever evidence is to the ordinary mind logically probative of a fact in issue is relevant and prima facie admissible (*see,* 21 NY Jur, Evidence, § 162). All that is necessary is "that it tend to convince that the fact sought to be established is so [or not so]. That it is equivocal * * * does not render it inadmissible (1 Wigmore, Evidence [3d ed.], §§ 31, 32)" (*People v Yazum*, 13 NY2d 302, 304; *see, People v Davis*, 43 NY2d 17, 27). In responding to a prosecutor's evidence in support of a theory of guilt, a defendant may explain away the evidence, deny it, or advance new facts tending to prove a counter proposition (*see generally,* 1 Wigmore, Evidence § 34 [3d ed 1940]). Evidence

---

1. Ms. Edwards was later examined and cross-examined under oath on videotape.

offered by a defendant in support of any of these responses would be logically relevant. It is settled, however, that evidence, although logically and technically relevant, is not necessarily admissible. It will be excluded "if it is too slight, remote, or conjectural to have any legitimate influence in determining the fact in issue" (Richardson, Evidence § 147 [10th ed]; *see,* 21 NY Jur, Evidence, § 161), and rulings on relevance and admissibility rest within the trial court's discretion (*see, People v Donnelly,* 103 AD2d 941; *People v Ahearn,* 88 AD2d 691).

Decisions involving reversals because of the improper exclusion of relevant evidence include *People v Figueroa* (80 AD2d 520) where defendant was convicted of unlawful possession of a gun which he claimed he had obtained innocently when he helped to break up a fight. The excluded proof was that of a witness who said she was with defendant one-half hour before the fight and that he did not then have the gun. In *People v Rojas* (83 AD2d 594) defendant, charged with burglary, claimed that he was living with the complainant at the apartment where the crime occurred and thus was rightfully in the apartment. It was held error to exclude evidence that the complainant and defendant had lived together in another apartment previously. (*Also, see generally, People v Daly,* 98 AD2d 803; *People v Murray,* 79 AD2d 993; *People v Baker,* 54 AD2d 876.) And in *People v Gilliam* (37 NY2d 722, *revg on dissent below* 45 AD2d 744) defendant was charged with robbing someone in an elevator in an apartment building. The robber ran out of the elevator at the fifth floor. The testimony of a neighbor who said that at about the time of the crime she saw a boy not the defendant running up the stairs from the fifth floor to the roof was admitted as relevant.[2]

Unquestionably, April Edwards' observations of a black man 5 feet 6 inches in height carrying a knife and running from the area of Pearl and Chippewa Streets sometime after 6:05 P.M. were relevant. It was evidence from which a jury could have concluded that that person (described as being almost a foot shorter than defendant) had stabbed Mills — not defendant. Like the neighbor's testimony of someone not the defendant running up the stairs near the time of the crime in *People v Gilliam* (*supra*), this evidence would have offered the jury an

---

**2.** The admission of this evidence was not attacked on appeal, and the writings at the Appellate Division and Court of Appeals proceed on the assumption that it was relevant. Rather, the defendant claimed — and the Court of Appeals agreed, that it was error to preclude defendant's evidence rebutting the prosecution position that the neighbor's testimony was a recent fabrication.

explanation for the crime other than the one advanced by the People.[3] Moreover, because the man seen by April Edwards was similar in appearance to 1 of the 3 witnesses (Speaks was also black and 5 feet 5 or 5 feet 6 inches tall), the proof was relevant as tending to corroborate defendant's testimony implicating the other three.

The People contend, however, that even if logically relevant, the proof was properly excluded in the court's discretion as speculative because it did not directly link the man the witness observed with the crime. We disagree. To be sure, April Edwards was not an eyewitness to the stabbing, and her testimony concerning the black man running with a knife at about the time and place of the stabbing would not have been direct evidence of the ultimate fact in issue but circumstantial evidence: direct evidence of facts from which the jury might have concluded (based on their everyday experience and common sense) that it was likely that the man Edwards saw — and not defendant — committed the crime. Such conclusion, if reached by the jury, as with any inference drawn from circumstantial evidence would necessarily have been in some respects conjectural. But the conclusion that a man running from the Pearl-Chippewa area with a knife had something to do with the stabbing is surely no more conjectural than the conclusion in *People v Rojas (supra)* that at the time of the crime the defendant and complainant were sharing the apartment where the alleged burglary occurred because defendant and complainant had shared another apartment previously, or the conclusion in *People v Gilliam (supra)* that the unidentified boy seen running up the stairs had committed the robbery and not the defendant. The case at bar differs markedly from *People v Johnson* (62 AD2d 555, *affd* 47 NY2d 785, *cert denied* 444 US 857, *supra*) upon which the People rely. In *Johnson* the ultimate fact sought

---

**3.** "[E]very sort of evidentiary fact may call for treatment in two aspects: 1. What is the extent to which other hypotheses must be excluded before the fact is admissible? 2. What are the other hypotheses which are then available for the opponent as explaining away the force of the fact thus provisionally admissible?

"This second aspect of each class of facts will hereafter be treated usually, for the respective subjects of Relevancy, under the head of Explanation. To illustrate:

"Ex. 1. In showing the defendant's connection with a murder, the fact is admitted of the finding of a knife, bearing his name, near the body of the deceased; the defendant, to refute the claimed conclusion that he was present with the knife at the murder, will be allowed to show that he lost the knife a month before; thus giving greater color of probability to the hypothesis that some one else was present with the knife" (1 Wigmore, Evidence § 34, at 423-424 [3d ed 1940]).

to be established was that a man other than defendant but answering his description had committed the crime (see, dissenting opinion in People v Johnson, 62 AD2d, at p 566). But unlike the proof of April Edwards here and that of the neighbor in People v Gilliam (supra), there was no direct proof that another person not defendant was in the vicinity at the time of the crime or, indeed, that there was such a person. In Johnson, the jury would have had to infer from the circumstantial evidence both that the man looking like the defendant existed and that he had committed the crime.

April Edwards, a totally disinterested witness, came forward immediately and gave police her statement, which was later videotaped. A jury could find this statement to be supportive of defendant's testimony and inconsistent with the versions of the events given by Boyd, Edwards and Speaks, which, we have observed, are weakened by inconsistencies and self-interest. Also it is noted that the jury in defendant's first trial could not agree on his guilt. We conclude that the trial court abused its discretion in excluding April Edwards' testimony.

### III

In view of the foregoing it is unnecessary to reach the defendant's contention (based on McCray v Abrams, 750 F2d 1113; but see, People v Charles, 61 NY2d 321; People v McCray, 57 NY2d 542, cert denied 461 US 961) that his constitutional rights were infringed by the prosecutor's allegedly systematic exclusion of blacks from the trial jury. We note that it is likely that in the near future the Supreme Court of the United States will rule on the issue in an appeal from the Supreme Court of Kentucky in which certiorari has been granted (Batson v Kentucky, cert granted __ US __, 53 USLW 3757 [Apr. 23, 1985]).

■ The prosecutor's conduct in asking defendant if witnesses against him were lying, while improper (see, e.g., People v Montgomery, 103 AD2d 622; People v McCormick, 100 AD2d 723; People v Balkum, 94 AD2d 933), did not under all the circumstances deprive defendant of a fair trial.

The judgment should be reversed, and a new trial granted.

GREEN, J. (concurring). I concur in the rationale and result expressed in the typically well-written opinion of Justice Hancock. I write separately, however, to express my view that there is a more fundamental and compelling reason to reverse, namely, that defendant's right to a trial by an impartial jury was violated by the prosecutor's use of peremptory challenges to exclude black prospective jurors from the jury.

We have declined to reach this issue in the past only because the voir dire was not transcribed (*see, People v Cassell,* 101 AD2d 1013) or because defendant failed to properly preserve the issue by a timely motion for a mistrial (*see,* CPL 280.10). That is not the case here. The record reveals that the prosecutor used peremptory challenges to exclude all but one of the black prospective jurors, despite the fact that one was a security guard who initially said he thought he would favor law enforcement, and another had a nephew who is a policeman. The record is devoid of any discernable reason for the prosecutor excluding these veniremen.

Of course, the People argue that the essence of a peremptory challenge is that no reason need be given (CPL 270.25 [1]). The People rely upon *Swain v Alabama* (380 US 202), *People v McCray* (57 NY2d 542, *cert denied* 461 US 961, *rearg denied* 60 NY2d 587) and *People v Charles* (61 NY2d 321), for the proposition that a prosecutor's motives in using peremptory challenges may not be scrutinized. The *Swain* test, however, requiring a defendant to establish a pattern and practice of discrimination in the prosecutor's exercise of peremptory challenges, is unworkable and unjust because a defendant is party to only one criminal proceeding, has no personal experience of discrimination in jury selection in other trials and has no practical way of discovering such information (*see, People v Thompson,* 79 AD2d 87, 106-107, n 18, *appeal withdrawn* 55 NY2d 879; *People v Wheeler,* 22 Cal 3d 258, 285-286, 583 P2d 748). Moreover, although the court in *People v McCray* (*supra*) and *People v Charles* (*supra*) held that no valid claim of discrimination in jury selection existed under the equal protection and due process clauses of our State Constitution, these decisions preceded the Second Circuit's holding in *McCray v Abrams* (750 F2d 1113 [petition for cert filed Mar. 4, 1985]) that a prosecutor's use of peremptory challenges to exclude blacks violated the 6th Amendment of the United States Constitution. The Second Circuit observed that the system of peremptory challenges was not constitutionally based and that if a defendant makes a prima facie showing that there is a "substantial likelihood" the peremptory challenges were used in a discriminating fashion, "it is the inscrutability of the peremptory challenge that must yield, not the constitutional right" (*McCray v Abrams,* 750 F2d 1113, 1130, 1132, *supra; see also, Walter v People,* 32 NY2d 147, 160). The Second Circuit held that defendant had amply met his burden by showing that eight minority veniremen had been excluded and that no discernible reason existed to believe that any of them would be biased (*McCray v Abrams, supra,* p 1133).

Even without reference to the Federal Constitution 6th Amendment, however (*see, Taylor v Louisiana,* 419 US 522; *cf. Batson v Kentucky,* __ Ky __, __ SW2d __ [Sup Ct, Ky, Dec. 20, 1984, slip opn pp 4-5], *cert granted* __ US __, 53 USLW 3757 [US Apr. 22, 1985]), there is significant reservoir of rights in our State Constitution (NY Const, art I, § 1) and State law (Civil Rights Law § 12) to entitle defendant to a reversal and a new trial (*see, Cooper v Morin,* 49 NY2d 69, 79, *cert denied sub nom. Lombard v Cooper,* 446 US 984; *People v Macerola,* 47 NY2d 257, 263; *People v Hobson,* 39 NY2d 479, 483-484). In my view, we should follow other jurisdictions which have not hesitated to depart from the *Swain* rationale in construing their own State constitutional guarantees of trial by an impartial jury (*see, e.g., People v Wheeler,* 22 Cal 3d 258, 583 P2d 748, *supra; Commonwealth v Soares,* 377 Mass 461, 387 NE2d 499, *cert denied* 444 US 881; *State v Neil,* 457 So 2d 481 [Fla]; *State v Crespin,* 94 NM 486, 612 P2d 716).

The purpose of a jury "is to guard against the exercise of arbitrary power — to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor" (*Taylor v Louisiana,* 419 US 522, 530). It seems self-evident that an impartial jury cannot be one that excludes a whole race of people (*see, Peters v Kiff,* 407 US 493, 503-504). Since on this record, defendant met his burden of demonstrating a substantial likelihood that the prosecutor's peremptory challenges were exercised solely on the basis of race, the trial court's failure to inquire into the prosecutor's reasons before denying defendant's motion for a mistrial requires reversal of defendant's conviction (*McCray v Abrams,* 750 F2d 1113, *supra; People v Thompson,* 79 AD2d 87, *supra*), without regard to the quantum or quality of the proof of defendant's guilt (*see, People v Crimmins,* 36 NY2d 230, 238).

CALLAHAN, DENMAN and SCHNEPP, JJ., concur with HANCOCK, JR., J. P.; GREEN, J., concurs in a separate opinion.

Judgment reversed, on the law and facts, and new trial granted.