People v Boyd (2018 NY Slip Op 01714)





People v Boyd


2018 NY Slip Op 01714


Decided on March 16, 2018


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 16, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., PERADOTTO, NEMOYER, TROUTMAN, AND WINSLOW, JJ.


98 KA 14-00955

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
DARRELL BOYD, DEFENDANT-APPELLANT. 






TIMOTHY P. DONAHER, PUBLIC DEFENDER, ROCHESTER (JANET SOMES OF COUNSEL), FOR DEFENDANT-APPELLANT. 
DARRELL BOYD, DEFENDANT-APPELLANT PRO SE.
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (LEAH R. MERVINE OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Supreme Court, Monroe County (Alex R. Renzi, J.), rendered May 14, 2014. The judgment convicted defendant, upon a jury verdict, of murder in the second degree. 
It is hereby ORDERED that the judgment so appealed from is unanimously affirmed.
Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]). The charge arose from an incident in 2007 in which defendant allegedly beat and strangled his former neighbor. Firefighters discovered the victim's body in her smoldering, smoke-filled apartment on Merchants Road in Rochester. An autopsy revealed that she died of asphyxial and blunt force injuries to her head and neck shortly before the fire. An ignitable liquid was found to be present on the victim's clothing and bedding, and fire investigators concluded that someone had intentionally set fire to her bed. Defendant was questioned by the police during the early stages of the investigation and, about 10 days after the murder, defendant told the investigators that he had been watching a Yankees versus Red Sox game on television at his wife's apartment on Brooks Avenue on the night of the victim's death, April 20, 2007. Defendant said that he left the apartment only once that day to go to the corner store before the game started, and surveillance video from his wife's apartment building showed defendant leaving the building through the west door at about 6:15 p.m. or 6:30 p.m., and returning about 15 or 20 minutes later with a shopping bag in his hand. The 911 report of the fire at the victim's apartment was placed at 7:43 p.m., and defendant did not reappear on the surveillance video at any time between 6:50 p.m. and 9:00 p.m. Thus, the surveillance footage appeared to corroborate defendant's alibi.
The investigation went cold until 2012, when a Combined DNA Index System (CODIS) database "hit" linked defendant's DNA profile to DNA material that had been collected from under the victim's fingernails on her right hand during her autopsy. Defendant was incarcerated on an unrelated matter at that time, and the investigators obtained a sample of his DNA for comparison. Further analysis by a forensic biologist at the Monroe County Crime Laboratory confirmed not only that defendant could not be excluded as a contributor to the DNA that was under the victim's fingernails, but also that "the probability of randomly selecting an unrelated individual who could be a contributor to the mixture obtained under the fingernail clippings of the right hand of [the victim] was less than 1 in 59.4 million."
Defendant and his wife had lived next door to the victim from 2002 to 2005 in the apartment building on Merchants Road where the victim died. Defendant, his wife, and the victim were neighbors and friends until 2005, when the victim witnessed a domestic altercation between the couple and intervened. The victim called the police, and defendant was arrested and [*2]prohibited from having contact with his wife. Defendant was on parole at the time, and the domestic violence incident was subsequently proved to be a violation of defendant's parole. As a consequence, defendant was incarcerated for 15 months. At defendant's trial on the murder charge herein, defendant's ex-wife testified that defendant blamed the victim for his incarceration after the 2005 incident. In addition, a jailhouse informant testified that defendant made various admissions to him, including that, after defendant returned to Rochester, he went to see a woman in an apartment building where he and his wife used to live, that he had choked the woman after she scratched him, and that he "burned up the bed" in an effort to cover up the evidence.
We reject defendant's contention that he was deprived of a fair trial by the cumulative effect of several alleged evidentiary errors made by Supreme Court. First, the court properly exercised its discretion in admitting testimony that the victim had intervened in a domestic incident involving defendant and his wife in 2005 that resulted in defendant's parole violation and incarceration. That evidence was inextricably interwoven with the material facts of the case and relevant to demonstrate defendant's motive (see People v Ray, 63 AD3d 1705, 1706 [4th Dept 2009], lv denied 13 NY3d 838 [2009]), and the court did not abuse its discretion in determining that the "probative value [of the evidence admitted] exceed[ed] the potential for prejudice resulting to the defendant" (People v Alvino, 71 NY2d 233, 242 [1987]; see generally People v Pryor, 48 AD3d 1217, 1217-1218 [4th Dept 2008], lv denied 10 NY3d 868 [2008]). The court minimized the potential for prejudice to defendant by prohibiting the People from eliciting testimony that defendant hit and choked his wife during the domestic incident, by precluding testimony concerning the nature of the underlying crime for which defendant was on parole, and by giving prompt limiting instructions to the jury (see People v Harris, 147 AD3d 1328, 1330 [4th Dept 2017]).
Second, the court properly exercised its discretion in admitting evidence that, in 2007, defendant exited his wife's apartment through a window to avoid a parole officer. Contrary to defendant's contention, no other logical conclusion can reasonably be drawn from the facts, and the evidence is relevant and probative of a material issue in the case, i.e., defendant's manner of ingress and egress at his wife's apartment. Surveillance video from the night of the murder appears to corroborate defendant's alibi that he was inside his wife's apartment on Brooks Avenue. A jailhouse informant testified, however, that defendant told him that he snuck in and out of his wife's apartment through her front and back windows, and that he avoided the security cameras by passing through two "blind spots" that he had identified. The informant further testified that defendant told him that he went into his wife's apartment in the view of the security cameras before he committed the crime, and then he left the apartment through a blind spot and committed the crime. Under the circumstances presented here, we conclude that the court did not abuse its discretion in admitting the above evidence (see generally People v Barnes, 109 AD2d 179, 183-186 [4th Dept 1985]).
Third, the court did not abuse its discretion in admitting, with a prompt limiting instruction, testimony from the victim's granddaughter that, shortly before the victim's death, the victim told her granddaughter that defendant had stopped by her apartment and that she was afraid that he would return. Inasmuch as evidence introduced prior to the admission of that testimony established that defendant was aware of the victim's unwelcoming state of mind toward him, and because the victim's statements did not refer to any threats or bad acts by defendant (cf. People v Meadow, 140 AD3d 1596, 1598-1599 [4th Dept 2016], lv denied 28 NY3d 933 [2016]), we conclude that the testimony of the victim's granddaughter was properly admitted under the state of mind exception to the hearsay rule (see People v Wlasiuk, 32 AD3d 674, 679 [3d Dept 2006], lv dismissed 7 NY3d 871 [2006]; see also People v Kimes, 37 AD3d 1, 17-18 [1st Dept 2006], lv denied 8 NY3d 881 [2007], reconsideration denied 9 NY3d 846 [2007]). Defendant's ex-wife testified that, after the domestic incident in 2005, the victim "disliked" defendant, and defendant "blamed the victim for everything." Although she did not know defendant to have a friendship with the victim in 2007, defendant's ex-wife testified that defendant stopped by the victim's apartment twice during the month preceding the victim's death. Defendant said he "was going down to the old apartment building" to "say hi to [the victim]" in March 2007. Shortly thereafter, defendant and his wife visited the victim at her apartment and invited her to join them for lunch. Defendant's ex-wife testified that, upon seeing defendant, the victim said she could not go and shut the door. The evidence demonstrated that defendant knew that he had not reestablished a positive relationship with the victim after the domestic incident in 2005, and he was aware of the victim's unwelcoming state of mind toward [*3]him. Contrary to the defense theory that defendant and the victim had an amicable and even sexual relationship prior to the victim's death, the evidence established that defendant was aware that the victim did not want him to visit her apartment.
In addition, we conclude that the court minimized the potential for prejudice to defendant by instructing the jury that the victim's statements to her granddaughter were not to be considered for their truth, but only as proof of the victim's general state of mind of not wanting defendant to visit her, regardless of whether he actually visited or intended to do so (see People v Reynoso, 73 NY2d 816, 819 [1988]). In any event, inasmuch as there is overwhelming proof of defendant's guilt and there is no significant probability that defendant otherwise would have been acquitted, we further conclude that any error in admitting the testimony of the victim's granddaughter's is harmless (see People v Williams, 25 NY3d 185, 194 [2015]; People v Smith, 289 AD2d 960, 961 [4th Dept 2001], lv denied 97 NY2d 761 [2002]; see generally People v Crimmins, 36 NY2d 230, 241-242 [1975]).
Fourth, the court did not abuse its discretion in admitting in evidence a portion of a telephone call recorded in jail. During the call, defendant described a distinctive and unique modus operandi that was sufficiently similar to the manner in which the instant crime was committed. On the recording, defendant discussed evading surveillance cameras and using fire as a weapon, and such discussion is probative of his identity as the perpetrator (see People v Frederick, 152 AD3d 1242, 1242-1243 [4th Dept 2017]). The portion of the telephone call played to the jury is more probative than prejudicial (see People v Matthews, 142 AD3d 1354, 1355 [4th Dept 2016], lv denied 28 NY3d 1125 [2016]), and " the court's limiting instruction minimized any prejudice to defendant' " (Frederick, 152 AD3d at 1243).
Viewing the evidence in light of the elements of the crime as charged to the jury (see People v Danielson, 9 NY3d 342, 349 [2007]), we reject defendant's further contention that the verdict is against the weight of the evidence (see People v Jackson, 66 AD3d 1415, 1416 [4th Dept 2009]; see generally People v Bleakley, 69 NY2d 490, 495 [1987]). We note that issues of credibility and the weight to be accorded to the evidence are primarily for the jury's determination (see People v Witherspoon, 66 AD3d 1456, 1457 [4th Dept 2009], lv denied 13 NY3d 942 [2010]), and we see no basis for disturbing the jury's determinations in this case.
We reject defendant's further contention that the court erred in refusing to suppress his statements to the police and his DNA sample on the ground that he was unlawfully subjected to custodial interrogation while incarcerated on an unrelated matter. Contrary to defendant's contention, the recording of the investigators' interview with defendant at the prison supports the court's determination that the meeting was brief and nonaccusatory in nature. Defendant met with the investigators in a large, open room, and agreed to speak with them about the "cold case." There were no threats or promises made by the investigators to induce or coerce defendant, and defendant voluntarily agreed to provide a sample of his DNA to the investigators upon their request. There was no "added constraint" that would have led defendant to believe that some other restriction had been placed on him "over and above that of ordinary confinement in a correctional facility" (People v Jackson, 141 AD3d 1095, 1096 [4th Dept 2016], lv denied 28 NY3d 1146 [2017] [internal quotation marks omitted]; see generally People v Alls, 83 NY2d 94, 100 [1993], cert denied 511 US 1090 [1994]).
We further conclude that the court did not err in denying defendant's request for an unredacted copy of a police incident report. The court conducted an in camera review of the report and determined that disclosure to defendant of the information that had been redacted from defendant's copy was unwarranted because the information was not relevant to the case (see generally CPL 240.20 [1]; Matter of Brown v Grosso, 285 AD2d 642, 644 [2d Dept 2001], lv denied 97 NY2d 605 [2001]).
Defendant contends in his pro se supplemental brief that he was deprived of effective assistance of counsel because his attorney failed to object to the prosecutor's characterization of the DNA evidence during summation. In particular, defendant contends that the prosecutor erroneously stated on summation that the DNA found under the victim's fingernails was in fact defendant's, in contrast to the testimony of the forensic biologist, who testified only that defendant could not be excluded as a source of the DNA. Given the forensic biologist's testimony concerning the extremely high odds of randomly selecting an unrelated individual who [*4]could be a contributor to the mixture found under the victim's fingernail clippings, we conclude that the prosecutor's statements on summation were "fair comment on the evidence" (People v Speaks, 28 NY3d 990, 992 [2016]). Even assuming, arguendo, that the prosecutor's comments on the DNA evidence found under the victim's fingernails could be considered a mischaracterization of the forensic biologist's testimony, we conclude that defense counsel's failure to object did not amount to ineffective assistance of counsel (see People v Smith, 150 AD3d 1664, 1667 [4th Dept 2017]; see also People v Ramsaran, 29 NY3d 1070, 1071 [2017]). Defendant's own testimony that he had been "having sex" with the victim as often as three times per week, and as recently as two days prior to her death, raised the reasonable possibility that his DNA might have been found on the victim (see People v Wright, 25 NY3d 769, 783 [2015]; cf. People v Jones, 134 AD3d 1588, 1589 [4th Dept 2015]). Thus, we reject defendant's implicit assertion underlying his ineffective assistance contention that he was somehow misidentified as the perpetrator by the use of the DNA evidence. Viewing the evidence, the law and the circumstances of this case in totality and as of the time of the representation, we conclude that defendant received meaningful representation (see generally People v Baldi, 54 NY2d 137, 147 [1981]).
The remaining contentions in defendant's main and pro se supplemental briefs are either based on matters outside the record and are appropriately raised by way of a CPL 440.10 motion (see People v DeJesus, 110 AD3d 1480, 1482 [4th Dept 2013], lv denied 22 NY3d 1155 [2014]), or are unpreserved for our review (see People v Jackson, 236 AD2d 628, 629 [2d Dept 1997], lv denied 90 NY2d 859 [1997]), and we decline to exercise our power to review any such unpreserved contentions as a matter of discretion in the interest of justice (see 
CPL 470.15 [6] [a]).
Entered: March 16, 2018
Mark W. Bennett
Clerk of the Court